In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-00-00222-CR


______________________________




EARL CHARLES REYNOLDS, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 188th Judicial District Court


Gregg County, Texas


Trial Court No. 27362-A




 




Before Cornelius, C.J., Grant and Ross, JJ.


Opinion by Chief Justice Cornelius



O P I N I O N



 Earl Charles Reynolds pleaded guilty, without a plea agreement, to the offense of unlawful
possession of a firearm by a felon. The trial court sentenced him to ten years' imprisonment. In the
same proceeding, Reynolds also pleaded guilty to four aggravated assault offenses. The trial court
sentenced him to fifteen years' imprisonment for one of the aggravated assault offenses and to ten
years' imprisonment for each of the others. All sentences were ordered to run concurrently.

 The trial court then recessed the proceedings and took up the State's motion to revoke
Reynolds' community supervision, which was previously imposed after Reynolds was convicted of
assault on a public servant. Reynolds pleaded true to the State's single allegation. The trial court
revoked Reynolds' community supervision and sentenced him to ten years' imprisonment. The trial
court announced from the bench that Reynolds' sentence would be stacked on the sentences he
received for the aggravated assault and unlawful possession of a firearm by a felon offenses. 
However, the judgment does not contain a stacking order.

 Reynolds has also filed appeals from the four aggravated assault convictions and the
revocation of his community supervision. We address each of those appeals in separate opinions.

 Reynolds' attorney has filed an appellate brief in which he concludes that after a review of
the record and the related law, the appeal is frivolous and without merit. He has evaluated the record
and has found no error that arguably supports an appeal. The brief thus meets the requirements of
Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and Stafford v. State, 813
S.W.2d 503 (Tex. Crim. App. 1991). Reynolds did not file a pro se response.

 We have this day released our opinion in Cause Number 06-00-00218-CR, Earl Charles
Reynolds v. The State of Texas. Because the briefs and arguments are identical to those raised in this
appeal, for the reasons stated in that opinion, we agree with counsel's assessment of the record and
affirm the trial court's judgment.


 William J. Cornelius

 Chief Justice


Date Submitted: October 15, 2001

Date Decided: October 16, 2001


Do Not Publish



had no dealings with him
before, Patterson became her target. 

 Kimball indicated that she was "high all the time" on a combination of methamphetamine,
alcohol, Xanax, and possibly Hydrocodone, and that she did not recall many events clearly. While
the day of Patterson's takedown seemed "like a dream" or a "haze," the following events remain
uncontested: 

 Kimball met with Thompson prior to the proposed drug buy. (2) She called Patterson using her
cell phone and arranged for him to purchase a quarter ounce of methamphetamine for her. In a
recorded conversation, Patterson quoted Kimball a price of $325 for the drugs and requested that
Kimball meet him at the Bonham Wal-Mart parking lot. (3) Thompson gave Kimball marked bills
totaling $325. Accompanied by several surveillance officers, Kimball drove to Wal-Mart, parked
her car, and waited for Patterson. A 1999 purple Dodge truck, known to be one often driven by
Patterson, entered the Wal-Mart parking lot and stopped beside Kimball's car. Kimball exited her
vehicle, gave Patterson the money, and got back inside her car, exchanging no conversation with
Patterson. Surveillance officer Bee positively identified Patterson while Thompson photographed
the vehicles. Neither officer actually saw Kimball pay over the money to Patterson. Thompson and
Bee then followed Patterson as he left the parking lot. 

 Kimball, who was instructed to go to a safe place where she commonly went, drove to the
American Legion hall, which maintained a bar. She informed the officers that Patterson would meet
her around seven o'clock. Although Walker was supposed to keep her under constant surveillance,
he remained parked outside the American Legion hall and could not observe Kimball as she
proceeded to play pool and drink beer inside. (4) 

 Meanwhile, the officers following Patterson identified him as he made a quick stop at the
Lucky Food Mart. He then made another brief stop at an apartment, traveled to a suspected drug
house, and went back to the apartment, where he remained for approximately forty-five minutes. 
Patterson then went to an abandoned gas station and drove past it several times. Thompson testified
that this tactic, which he called a "heat run," is commonly employed by drug traffickers to determine
whether they are being followed. Eventually, Thompson observed Patterson's purple truck enter the
American Legion hall parking lot. Kimball's vehicle fell in line behind Patterson, and Thompson
trailed behind Kimball. 

 When the vehicles were half a mile west of the Bonham city limits, Kimball pulled over on
the highway behind Patterson. Thompson drove past the vehicles, and circled back around without
headlights in order to better observe the vehicles. The dark, rainy night obstructed his vision and he
was unable to see what happened inside Kimball's vehicle. Thompson testified that he observed
Patterson exit his truck and enter Kimball's car. Kimball indicated that she remembered very little
of this meeting, recalling only that she had asked Patterson how he was doing and then watched as
Patterson returned to his truck. 

 Her poor recollection resulted in two versions of the following events. Kimball next
remembers being with Thompson at the Ector convenience store in his truck. She says there were
drugs in Thompson's vehicle, but was not sure where they came from. Kimball testified, "I guess,
I gave them to him.  . . . .  I must have, you know, I can't be sure. I was high myself," on
methamphetamine, Xanax, and alcohol. 

 Thompson testified he ordered officers in Bonham to stop Patterson on his way back into
town and instructed Kimball to meet him at the Ector convenience store. Thompson said Kimball
had a clear bag containing a white crystal substance that appeared to be methamphetamine. He
retrieved her recording device and mailed the substance to the Texas Department of Public Safety
(DPS) laboratory for testing. Because the recording device can only record a designated number of
hours, its capacity was exceeded before Kimball's meeting with Patterson at the American Legion
hall, as well as the critical subsequent events following that meeting and there was no recording of
their conversations available. 

 Patterson was detained and arrested in Bonham. A search of his car produced only a cell
phone (which indicated that it had been used to correspond that day with Kimball). The officers
never located the marked money, which had been given previously to Kimball; no search was
conducted of the purported drug house where Patterson had stopped earlier in the day. The DPS
crime laboratory in Garland conducted tests on the package which Thompson mailed to it; the tests
revealed that it contained 6.76 grams of methamphetamine. The jury found Patterson guilty of
delivering this methamphetamine. 

II. Thompson's Testimony Was Not Hearsay 

 We review rulings admitting statements alleged to be hearsay for an abuse of discretion. 
Zuliani v. State, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). A trial court abuses its discretion
when it acts arbitrarily, unreasonably, or without reference to guiding rules or principles. Howell
v. State, 175 S.W.3d 786, 792 (Tex. Crim. App. 2005); Reynolds v. State, 277 S.W.3d 355, 371 (Tex.
App.--Texarkana 2007, no pet.). 

 Patterson first complains of alleged hearsay statements made by Thompson after he was
recalled by the State. The following exchange occurred after the evidence recited above was
developed: 

 Q. When you got to Ector and y'all both got to a convenience store there,
where was the methamphetamine?


 A. We pulled up next to each other at the gas pumps. And she jumped
in out of her car into my undercover vehicle. And she had it in her hand. 


 Q. Okay. So she gave it to you?


 A. Yeah. She laid it on the console. 


 Q. Did she identify anybody who had been in her car during that stop?


 A. Yes, she said Milton. 


 [Counsel for Patterson]: I'll object to hearsay. 


 [Counsel for State]: Your Honor, it's a statement for identification,
not hearsay. 


 THE COURT: Overruled.


 A. She advised Milton Patterson. 


 Q. (By Mr. Setterberg) At that time in Ector?


 A. In Ector had delivered that. Had not --


 [Counsel for Patterson]: I'm going to object to hearsay, offered
for the truth of the matter asserted. 


 THE COURT: Overruled. 


 A. Not only did she mention that, she also advised that he stated it
weighed right. 


 [Counsel for State]: Pass the witness, Your Honor. 


 Hearsay "is a statement, other than one made by the declarant while testifying at the trial or
hearing, offered in evidence to prove the truth of the matter asserted." Tex. R. Evid. 801(d). It is
inadmissible except as provided by statute. Tex. R. Evid. 802. A statement is not hearsay if the
declarant testifies at trial, is subject to cross-examination, and the statement is "one of identification
of a person made after perceiving the person." Tex. R. Evid. 801(e)(1)(C). Here, Kimball was
present at trial, was actually recalled after Thompson was recalled (and was thus subject to cross-examination), the statement involved an identification of Patterson, and Kimball's testimony shows
she had ample opportunity to perceive Patterson. Thus, this statement was one of identification and
was not hearsay. Chaney v. State, No. 01-08-00204-CR, 2009 WL 1086952, at *10 (Tex.
App.--Houston [1st Dist.] Apr. 23, 2009, no pet.) (mem. op., not designated for publication);
Rodriguez v. State, 974 S.W.2d 364, 371 (Tex. App.--Amarillo 1998, pet. ref'd) (testimony by
officer that victim had identified appellant as assailant not hearsay per Rule 801(e)(1)(C) of Texas
Rules of Evidence); Miller v. State, 843 S.W.2d 265, 267 (Tex. App.--Fort Worth 1992, no pet.). 
Moreover, Thompson merely reiterated Kimball's identification recited in her previous testimony. 
See Rodriguez, 974 S.W.2d at 371. 

 Patterson also argues that while the State's question, "At that time in Ector?" did not call for
hearsay itself, the response, "In Ector had delivered that. Had not --" was inadmissible hearsay. It
is not clear that Thompson was testifying about an out-of-court statement made by Kimball at this
point. Consequently, we cannot find the trial court abused its discretion in overruling the objection. 
Last, Patterson refers to Thompson's "unsolicited and entirely gratuitous statement," "[n]ot only did
[Kimball] mention that, she also advised that he stated it weighed right." We agree that this
statement was hearsay. However, Patterson failed to object to this part of the testimony; failing to
object, he failed to preserve the issue for review. Tex. R. App. P. 33.1; Martinez v. State, 91 S.W.3d
331, 336 (Tex. Crim. App. 2002). 

 We overrule this point of error. 

III. Legally and Factually Sufficient Evidence Supported the Verdict

 Patterson next contends that the evidence was both legally and factually insufficient to
support his conviction. Legal and factual sufficiency questions involve distinctly separate analyses. 
The requirement of legal sufficiency serves as a tool to determine whether submission of an issue
is required. Clewis v. State, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). In other words, if the
evidence in this case was insufficient to raise an issue of Patterson's guilt, it should not have been
submitted for the jury's decision, and we must render a judgment of acquittal. Id. When conducting
this analysis, we review all of the evidence in the light most favorable to the verdict and determine
whether any rational jury could find the essential elements of the crime beyond a reasonable doubt. 
Lacour v. State, 8 S.W.3d 670, 671 (Tex. Crim. App. 2000) (citing Jackson v. Virginia, 443 U.S.
307, 319 (1979)); Clewis, 922 S.W.2d at 132-33. We also measure the evidence "against the
elements of the offense with the same kind of analysis as that applied in the test for a hypothetically
correct jury charge for the case." Ferralez v. State, No. 06-08-00064-CR, 2009 WL 454335, at *1
(Tex. App.--Texarkana Feb. 25, 2009, no pet.) (mem. op., not designated for publication) (citing
Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)); see also Grotti v. State, 273 S.W.3d
273, 280 (Tex. Crim. App. 2008). The hypothetically correct jury charge "sets out the law, is
authorized by the indictment, does not unnecessarily increase the State's burden of proof or
unnecessarily restrict the State's theories of liability, and adequately describes the particular offense
for which the defendant was tried." Malik, 953 S.W.2d at 240. 

 Once this threshold Jackson standard is met, however, we will not sit as the thirteenth juror
re-evaluating the weight and credibility of the evidence. Williams v. State, 235 S.W.3d 742, 750
(Tex. Crim. App. 2007); Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Instead,
we give full play to the jury's responsibility to weigh the evidence, resolve conflicts in the testimony,
and draw reasonable inferences from basic facts. Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App.
2000); Clewis, 922 S.W.2d at 133; Bottenfield v. State, 77 S.W.3d 349, 354 (Tex. App.--Fort Worth
2002, pet. ref'd) (citing Jackson, 443 U.S. at 319). 

 On the other hand, because factual sufficiency is an issue of fact, we are not free to re-weigh
the evidence and set aside the jury verdict merely because we feel a different result is more
reasonable. Clewis, 922 S.W.2d at 135. Instead, we give due deference to its determinations and
will find the evidence to be factually insufficient only when necessary to prevent manifest injustice. 
Johnson, 23 S.W.3d at 8-9, 12; Clewis, 922 S.W.2d at 133, 135. Thus, unlike our legal sufficiency
review, we examine the evidence in a neutral light when assessing factual sufficiency and determine
whether the proof of guilt is so obviously weak as to undermine confidence in the verdict, or, if taken
alone, is greatly outweighed by contrary proof so as to be clearly wrong and unjust. Johnson, 23
S.W.3d at 11; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997); Harris v. State, 133
S.W.3d 760, 764 (Tex. App.--Texarkana 2004, pet. ref'd). We also use the hypothetically correct
jury charge to evaluate factual sufficiency. Grotti, 273 S.W.3d at 281. 

 Delivery of a controlled substance is an offense under the Texas Controlled Substances Act. 
 Tex. Health & Safety Code Ann. § 481.112(a) (Vernon 2003). Deliver "means to transfer,
actually or constructively, to another a controlled substance . . . .  The term includes offering to sell
a controlled substance." Tex. Health & Safety Code Ann. § 481.002(8) (Vernon 2003). The
applicable hypothetically correct jury charge would, therefore, require the State to bring forth proof
of the following elements: that (1) Patterson, (2) had direct or indirect control of, (3) a controlled
substance, (4) which he knowingly or intentionally, (5) delivered. See Hayes v. State, 265 S.W.3d
673, 680 (Tex. App.--Houston [1st Dist.] 2008, pet. ref'd). Actual delivery consists of transferring
or surrendering "the real possession and control of a controlled substance from one person to another
person." Heberling v. State, 834 S.W.2d 350, 354 (Tex. Crim. App. 1992); Ex parte Perales, 215
S.W.3d 418, 420 (Tex. Crim. App. 2007). 

 A constructive transfer can occur by placing the contraband "in a particular location and then
advis[ing] the recipient of this location so that the recipient can retrieve" it. Sims v. State, 117
S.W.3d 267, 268-69 (Tex. Crim. App. 2003). Deliver by offer to sell "is complete, when, by words
or deed, a person knowingly offers to sell what he states is a controlled substance." Stewart v. State,
718 S.W.2d 286, 288 (Tex. Crim. App. 1986). 

 "[P]roof of an offer to sell must be corroborated by: (1) a person other than the person to
whom the offer is made; or (2) evidence other than a statement of the person to whom the offer is
made." Tex. Health & Safety Code Ann. § 481.182 (Vernon Supp. 2008). Corroboration can
include an electronic recording of the transaction, testimony of witnesses other than Kimball, and
evidence that Patterson had possession of or access to the controlled substance offered. See Knight
v. State, 91 S.W.3d 418, 422 (Tex. App.--Waco 2002, no pet.). Since the jury must "almost always"
infer the mental culpability of the defendant from their acts, conduct, and words, evidence which
corroborates Patterson's testimony will be probative of his intent or knowledge. Id. at 423. 

 In reviewing the evidence above, we conclude, not only that the evidence was sufficient to
raise an issue about Patterson's guilt, but also that a rational jury could find delivery beyond a
reasonable doubt based on the hypothetically correct jury charge. Lacour, 8 S.W.3d at 671. While
Kimball's memory of the event is faded, cloudy, and sketchy, the jury could have easily chosen to
believe Thompson's version of the events--that the search of Kimball before the operation
commenced showed that she had no contraband, but she produced methamphetamine to Thompson
after meeting with Patterson on the side of the highway--suggesting an actual or constructive
transfer from Patterson to her. Kimball's testimony that Patterson offered to sell a quarter ounce of
methamphetamine to her is corroborated by Thompson's testimony, tape recording Exhibit 1 ( where
Patterson is heard quoting a price of $325 and requesting Kimball meet him at the Wal-Mart parking
lot), and tape recording Exhibit 8 (which contained the following excerpts):

 [Thompson:] Okay. Today's day is March 13, 2007. It's approximately 5:30
p.m. We've called--what's Milton's phone number? He's going to meet us at Wal-Mart . . . That's Milton Patterson. He drives what? Purple Dodge Truck?


 [Kimball:] Purple truck. 


 [Thompson:] Purple truck. Okay. He's going to meet us at Wal-Mart, you're
going to give him the $325, he's going to go get a quarter ounce of meth, he's going
to deliver it back to us at the VFW. (5)


 . . . .


 [Kimball on telephone to Patterson:] "Hey, I was just calling to see what's
up. Is everything okay? . . . . Um, anyway I'm going to be in my car sitting out front
of the American Legion. So let me know something alright. If you can't just bring
me my money."


 Certainly, this evidence was legally sufficient to submit the issue of Patterson's guilt to the
jury under all three definitions of delivery. 

 Further, we give due deference to the jury's determination based on reasonable inferences
from this evidence that Patterson knowingly offered to sell methamphetamine to Kimball through
his words, and by his deeds in taking Kimball's money, traveling to a known drug house, returning
to the American Legion hall, and meeting with Kimball on the side of the highway. See Stewart, 718
S.W.2d at 288 ("[W]hen delivery is by offer to sell no transfer need take place. A defendant need
not even have any controlled substance."). Because we cannot say that the verdict is clearly wrong
and unjust, or that proof of Patterson's guilt is obviously weak or is greatly outweighed by contrary
proof, we find the evidence was both legally and factually sufficient. 

IV. Conclusion

 We affirm the trial court's judgment.




 Bailey C. Moseley

 Justice


Date Submitted: May 4, 2009

Date Decided: May 12, 2009


Do Not Publish

1. Kimball states Thompson was aware of the charges pending against her. Thompson
contradicted the claims, denying knowledge of any pending charges or of having made any promises
to Kimball, even though he was aware "that she was stopped in a car, and her husband or boyfriend
had went to jail for drugs." He admits that he did not have much time to determine if Kimball was
credible. Officer Terry Bee, who was working with Thompson, testified that he was aware that
Kimball was on community supervision and was participating in the drug court program. 
2. Kimball denied going to the sheriff's office or being searched. This fact was contested by
Thompson and Officer Wayne Walker, who reported that they searched Kimball and her vehicle for
contraband and money. The officers admit they were unable to do a full pat-down search because
a female officer was not present. 
3. Thompson testified that he recognized Patterson's voice during this initial conversation. 
Although a price and meeting place were arranged, no mention of drugs was made on this tape
recording. 
4. Walker even admits he "lost her because of where I was setting up at . . . [for] [a]bout a
minute-and-a-half." 
5. The record demonstrates that the American Legion was referred to as the V.F.W.